

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ELVIA BARRIOS, | ) |
| Plaintiff, | ) |
| v. | ) No. 06 C 2853 |
| | ) Honorable Charles R. Norgle |
| SHERMAN HOSPITAL | ) |
| Defendant. | ) |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Defendant Sherman Hospital's motion for summary judgment (the "Motion"), brought pursuant to FED R. OF CIV. P. 56. For the following reasons, the Motion is granted.

## I. BACKGROUND

### A. Facts[1]

At approximately 7:00 p.m. on October 8, 2004, Plaintiff Elvia Barrios ("Barrios"), nearly sixteen weeks pregnant, was taken by her family to Defendant Sherman Hospital's ("Sherman" or the "Hospital") emergency room complaining of severe abdominal pain.

According to the Hospital's triage procedures, upon presentment, a patient is to be assessed by a triage nurse and placed into one of three categories: (1) emergent; (2) urgent; or (3)

---

[1] Neither Sherman nor Barrios filed statements of undisputed facts as required by Local Rule 56.1. Although the Court could certainly strike both Sherman's Motion and Barrios' response for failure to comply with the local rule, see Malec v. Stanford, 191 F.R.D. 581 (N.D. Ill. 2000), where no party has objected and where no party would be prejudiced by the lack of 56.1 statements and responses, the Court will decide the Motion based on the facts presented in the parties' briefs and the exhibits attached to those briefs. Therefore, unless otherwise attributed, the Court takes all facts presented in this Opinion from the parties' summary judgment briefs and exhibits and notes the disputed facts within.

1

non-urgent. See Dr. Frank Pangallo Dep. Ex. 1. Emergent patients "are considered critically ill or injured and may require resuscitative or immediate interventions to avoid loss of life or permanent disability." Id. Urgent patients "require prompt but not immediate care, these patients have conditions in which a delay of up to two hours will not compromise life or limb." Id. Non-urgent patients "are considered to have a minor illness or injury. These patients may wait greater than two hours without an increase in morbidity or mortality." Id.

Upon Barrios' arrival at the emergency room and prior to her registration, Sherman nurse Jim Reardanz ("Reardanz") triaged her at approximately 7:10 p.m.. Barrios told Reardanz that she was experiencing abdominal pain and had been diagnosed with a urinary tract infection by her obstetrician two days earlier. Barrios indicated her pain was a ten on a scale of one to ten. According to Reardanz's review of Barrios' emergency record, Reardanz took Barrios' vital signs and found her blood pressure, pulse, respiratory rate, oxygen saturation and temperature all within the normal range. Based on his assessment of Barrios' complaint and vital signs, Reardanz categorized Barrios as an "Urgent" patient, as opposed to "Emergent." He then directed her to the emergency room's registration desk where Barrios registered at 7:14 p.m.

After registration, Barrios waited in the emergency room waiting area for approximately ninety minutes because, according to Dr. Francis McCormack ("Dr. McCormack"), an attending physician in the Hospital emergency room on October 8, 2004, the emergency room staff was treating patients with more severe conditions than Barrios. Specifically, from 7:10 p.m. to 8:45 p.m. the Hospital treated: (1) a patient with acute cardiopulmonary arrest; (2) a patient with a seizure disorder; and (3) a patient with acute chest pain. According to Dr. McCormack's unrebutted affidavit, all of these patients were in emergent condition. Dr. McCormack Affidavit at ¶ 4.

2

At approximately 8:45 p.m., Barrios went to a bathroom in the emergency room waiting area and suffered a spontaneous miscarriage. Sherman nurse Marryl Stratton ("Stratton") went to the bathroom after two young girls approached Stratton to tell her that "the[ir] sister was having a baby in the bathroom." Stratton Dep. at 25. Stratton saw Barrios and the fetus and went to the main emergency room to get help. Stratton returned to the bathroom with a towel, placed the fetus in the towel and took Barrios to the treatment area of the emergency room.

Subsequently, at some point between 9:00 p.m. and 9:30 p.m., Barrios was seen by Dr. McCormack. Dr. McCormack conducted "a history and a physical" of Barrios. Dr. McCormack Dep. at 23. He administered a blood test to Barrios and conducted a pelvic examination. Barrios' blood levels were normal. The pelvic examination revealed that Barrios was experiencing some bloody discharge so Dr. McCormack massaged Barrios' uterus until the discharges ceased. Dr. McCormack then contacted Dr. Deborah Wollard ("Dr. Wollard"), the obstetrician on call that night, to consult with her as to the proper treatment for Barrios. After Dr. McCormack consulted with Dr. Wollard, he administered Barrios Vicodin for any discomfort she was experiencing. Barrios was then discharged shortly before 11:00 p.m. based on Dr. McCormack's assessment that she was "stable." Dr. McCormack Dep. at 31.

On October 9, 2004 at 10:30 p.m., Barrios returned to the Sherman emergency room complaining of vaginal bleeding. Barrios was admitted to the Hospital and Dr. Wollard then performed a dilation and curettage on Barrios. Following the procedure, Barrios was discharged from the Hospital at approximately 2:00 a.m. on October 10, 2004.

### B. Procedural History

On May 22, 2006, Barrios filed a two-count Complaint against Sherman with the United States District Court. Barrios brought Count I of her Complaint under 42 U.S.C. § 1395dd,

3

alleging that Sherman violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"). Count II of the Complaint is an Illinois state law claim for intentional infliction of emotional distress. In response to the Complaint, Sherman filed a motion to dismiss. The Court denied Sherman's motion to dismiss on December 15, 2006, holding that Barrios' allegation that Sherman failed to properly screen her for an emergency medical condition was sufficient to state a claim under EMTALA. On January 5, 2009, Sherman filed a motion for summary judgment as to Barrios' EMTALA claim (the "Motion"). See Def.'s Mot. for Summ. J. The Motion is now fully briefed and before the Court.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp., 278 F.3d 693, 699 (7th Cir. 2002).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chi., 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc.,

4

369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The inferences construed in the nonmoving party's favor, however, must be drawn from specific facts identified in the record that support that party's position. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hosp. and Med. Ctr., 328 F.3d 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888-89 (1990)).

## B. Barrios' EMTALA Claim

Barrios asserts that summary judgment is not appropriate here because she "adduced sufficient evidence to establish that Defendant failed to discover the Plaintiff's emergency medical condition." Pl.'s Resp. at 1. Such a failure, however, even if established conclusively, would not give rise to liability under EMTALA.

EMTALA mandates that when an individual seeks treatment from a hospital's emergency department, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). If the hospital determines that an "emergency medical condition" does exist, then the hospital must either "stabilize the medical condition," id. at § 1395dd(b)(1)(a), or "transfer [] the individual to another medical facility." Id. at § 1395dd(b)(1)(b).

Importantly, "EMTALA was not intended to be used as [a] federal malpractice statute, but rather was enacted to prevent patient dumping (which is the practice of refusing to treat patients who are unable to pay)." McCullum v. Silver Cross Hosp., No. 99 C 4327, 2001 WL 1516731, at *3 (N.D. Ill. Nov. 28, 2001) (citing Marshall v. E. Carroll Parish Hosp. Serv. Dist., 134 F.3d 319 (5th Dist. 1998)); see also Curry v. Advocate Bethany Hosp., 204 Fed. Appx. 553, 556 (7th Cir. 2006) ("EMTALA is not a federal malpractice statute."); Baber v. Hosp. Corp. of America, 977 F.2d 872, 880 (4th Cir. 1992) ("The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate first response to a medical crisis' for all patients . . . .") (quotations and citation omitted). Thus, Barrios' argument that the Hospital is liable under EMTALA for its alleged misdiagnosis of Barrios' alleged emergency medical condition fails on its face. See Anadumaka v. Edgewater Operating Co., 823 F.Supp. 507, 510 (N.D. Ill. 1993) ("Although plaintiffs disagree with the nurse's determination that [plaintiff] had a non-emergency condition, that argument is one of misdiagnosis and one that is not addressed by [EMTALA].") (citations omitted). The Court expresses no opinion as to the merits of any state law negligence or medical malpractice claims Barrios may have against Sherman, but only notes that Barrios cannot recover under EMTALA for such claims. See Baber, 977 F.2d at 880 ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery. Likewise, the liability of a hospital for the tortious actions (or inactions) of its personnel should be resolved under those same principles.").

Barrios also argues that the Hospital's screening of Barrios was not "appropriate" under EMTALA because the screening "was so deficient that it essentially amounted to no screening." Pl.'s Resp. at 16. Under EMTALA, "a hospital performs [an] appropriate medical screening when 'it conforms in its treatment of a particular patient to its standard screening procedures.'" Anadumaka, 823 F.Supp. at 510 (quoting Gatewood v. Washington, 933 F.2d 1037, 1041 (D.C. Cir. 1991)). "[I]nstances of negligence in the screening or diagnostic processes, or of mere faulty screening, are not actionable under [EMTALA]." McCullum, 2001 WL 1516731, at *4 (citing Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132 (8th Cir. 1996)); see also id. (citing Marshall, 134 F.3d 319) ("Although [an emergency room nurse's] diagnosis may have been wrong, whether there has been an appropriate medical screening examination is not judged by the practitioner's proficiency in accurately diagnosing a patient's illness.") (quotations omitted).

Accordingly, in Anadumaka, the court found a hospital's medical screening appropriate under EMTALA where "the evidence demonstrate[d] that the standard practice of triage and registration were performed in [defendant's] emergency room" and plaintiffs provided no evidence "to indicate that they were treated differently because of their financial condition." 823 F.Supp. at 510. Similarly, in McCullum, the court found a hospital's screening of a pregnant plaintiff appropriate where "there [was] no evidence that [defendant's screening nurse] did not follow the same procedure with respect to all pregnant women he screened." 2001 WL 1516731, at *4.

In the present case, the evidence demonstrates that (1) Barrios was seen by a nurse shortly after Barrios' arrival at the emergency room; (2) the nurse received a brief medical history from Barrios and tested her vital signs; (3) the nurse then categorized Barrios as an

7

"Urgent" patient and asked her to register at the emergency room registration desk; and (4) a little more than two hours later, a doctor examined Barrios and determined her condition to be stable. Barrios puts forth no evidence that the Hospital's screening of Barrios deviated in any way from the Hospital's standard screening procedures. Rather, Barrios argues that "[t]he hospital violated the provisions of EMTALA by disregarding her emergency medical condition . . . ." Pl.'s Resp. at 17. Importantly, however, Sherman's alleged failure to properly identify Barrios' medical condition is not relevant to the question of whether her screening was appropriate. See McCullum, 2001 WL 1516731, at *4. Thus, given the absence of evidence that Sherman's screening of Barrios failed to conform to its emergency room protocol, as in McCullum and Anadumaka, there is no question that Sherman's medical screening of Barrios was "appropriate" under EMTALA.

Finally, the Court notes that Barrios' acknowledgement that Sherman did not diagnose Barrios with an emergency medical condition precludes a jury from finding Sherman liable under § 1395dd(b). A hospital's duty to provide necessary stabilizing treatment under § 1395dd(b) only arises after the hospital determines that the patient has an emergency medical condition. Here, both parties agree that Sherman did not diagnose Barrios with an emergency medical condition. Therefore Sherman cannot be liable for any failure to provide stabilizing treatment. See Deberry v. Sherman Hosp. Ass'n., 769 F.Supp. 1030, 1035 (N.D. Ill. 1991) (holding that defendant could not be liable under EMTALA even if a jury found that it failed to stabilize defendant's emergency medical condition because defendant's doctor determined that no emergency medical condition existed); see also Anadumaka, 823 F.Supp. at 510 (citing Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 271 (6th Cir. 1990)) ("Here

[plaintiff] was not diagnosed with an emergency medical condition and therefore the hospital cannot be in violation of subsection (b) of the [EMTALA] statute.").

### III. CONCLUSION

For the foregoing reasons, Sherman Hospital's motion for summary judgment is granted.

IT IS SO ORDERED.

ENTER:

*[signature]*

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: April 3, 2009